May it please the court. I represent Mr. Boyer in this case. We are before the court to seek relief because the government, we believe in this case, obtained evidence which was requisite to the trial and the conviction in an extraordinary way. By using a subpoena as though it were a search warrant, but as though it were a search warrant not that would be issued under Rule 41, but that it may have, as it may have been issued as a general warrant when Samuel Adams thundered against the general warrants before the revolution. The three specific areas that we seek relief from the court are the following. First, attorney-client privilege documents, correspondence between various corporate entities and individuals and 14 separate law firms were seized. Second, Mr. Boyer's office itself was entered and we believe that he was in effect in the position of a tenant and in the position of the appellants in the Takeda case and the Jones case decided by this court. And that absent a warrant and over his objection, the seizures of any documents from his office, from his own individual office were improper. And then third and finally, the wholesale seizure of documents that were completely unrelated to the corporate entity whose trustee did give permission to the government to go through documents was completely inappropriate and unjustified under the Fourth Amendment. Mr. Aredel, what do we do with the district courts factual findings that basically hold or conclude that there was consent to enter the premises, that the bankruptcy trustee was the lawful custodian of the documents, that the procedures that the agents used to box up your Mr. Boyer's records were appropriate and so on, and that this really wasn't a search. It was just a situation where a custodian didn't want to incur the time and expense of doing a privilege review on all this stuff before responding to the grand jury subpoena due sestima. With respect to that, Judge Tallman, those were more in the nature of conclusion of law than findings of fact to which deference is required. Well, it's a finding of fact with regard to the access and so on to the premises, isn't it? True. That is true. And we don't quarrel with that. And also with regard to whether Mr. Boyer actually maintained an office for which he'd made arrangements for rent, that's a factual conclusion, isn't it? Yes, although I'd like to address that. With respect to the rent, and your questions are all on the money, in answering them, I'd like to give you a factual recitation of largely undisputed facts which I think will address the legal determinations as to which this Court's determination is de novo. I agree that on factual determinations, any specific factual finding is subject to review for clearly erroneous. With respect to Mr. Boyer's situation, here is the situation that occurred. The government obtained an affidavit from Mr. Villafran, one of the trustees, one of the two trustees. And he said, well, as far as I let Mr. Boyer stay there, because he was going to be working on some schedules to help in the bankruptcy. He had previously been working there, and that was previously his office. He had been a corporate employee for one of the entities. And he had my permission to be there, but he didn't pay me rent. And you have to understand the factual setting was such that this occurred five years. We were having our hearing five or six years after the events. When he came into court and we cross-examined him, and this can be found, Judge Tolman, at pages 871 through 873 of the excerpt of clerk's record. And nobody contends, nobody ever disputed Mr. Villafran wasn't lying. He was endeavoring to tell the truth. But there were some definite problems, which you'll see in the transcript. He just didn't remember. He has a lot of materials, a lot of matters, and he just didn't remember. When he was in court, though, when I cross-examined him, he said, oh, yeah, now I remember. There was an arrangement. We decided to keep a BRC going as an ongoing entity. People were coming in to look about buying it. And I said to Mr. Boyer, you can have that office in return for paying the whole phone bill for BRC. Now, Mr. Boyer and the BRC was an ongoing business. That would be an expense that otherwise would have been incurred by the trustee. That was in lieu of rent. Now we're back to my factual finding question. We would have to find that the district court clearly erred and should have credited your cross-examination of the trustee in a more weighty manner than the district judge did because the district judge, notwithstanding your cross-examination, which I'm sure was very effective, found, as a matter of fact, that there was no arrangement for the rent and that the only thing that Mr. Boyer had agreed to do was to pay for the use of the telephone. No, he did not find that. That's what the government argues. The judge's findings were actually a little sparse in that regard. What he did was sort of split the difference. He said that, well, I find that Mr. Boyer had permission to be there and that there was this informal arrangement, but the trustee did not relinquish control and custody of the premises. And there was a sign posted at the door, right, that told the world that the trustee is? It says the trustee is everything. And in his initial ruling, Judge Miller said, all right, but that doesn't mean that the government can go in and seize everything. It goes to the issue of the scope of the subpoena, the particular documents and the scope of the consent. But then he finds consent to allow the agents to go in and look at all the documents on the premises and take what they want. Well, let me address that now, if I could, by just giving you the corporate structures. There were a series of corporations and they had fallen upon hard times. In January, they moved to this suite of offices. Mr. Boyer was an official who had one of the offices there. One of the corporations was called ATI. It was first into bankruptcy. The bankruptcy court appointed a trustee, Mr. Davis. It's a separate entity. And the government never alleged that this is just a flim flam or that they're not legitimate separate corporate entities. Davis was appointed. Then BRC goes into bankruptcy, a separate entity. Mr. Villaplana was appointed. There were also, with respect to ATI, there were some subsidiaries, wholly owned subsidiaries, but they had separate corporate structures, separate boards of directors and were separate entities. Now, what happened in this case is the government gave Mr. Villaplana a subpoena. And the subpoena can be found at pages 78 through 81 of the excerpt of clerk record. And it called for the production of certain corporate records from BRC. Now, as to that, Judge Tolman, 100 percent right, we don't dispute that. Villaplana was the trustee, even though it was a subpoena for May and it wasn't executed or it wasn't. But we know that's common. You get extensions all the time. No problem. That's right. No problem. I'm not going to be hyper technical on that. And Villaplana had the right to say, BRC documents, take them. Well, wasn't the problem that the district court found they were commingled and that Mr. Davis, to the extent that he was the custodian for other records, basically said to Villaplana, you take care of it. You know, you have the authority. So, therefore, he had actual and apparent authority as the agent of Mr. Davis to consent on behalf of some of these other entities. And then we got the commingling problem. Two things in answer to that, Judge Tolman. First of all, with respect to the commingling problem, it's a legitimate point, but we did, and there is in the record an extensive, believe me, it was tedious to the extreme. The judge wanted, the judge had told us at the first hearing, well, we can't do this on a general basis. Do it document by document. We had to go through every little, thousands. I know. Color-coded where it's this. It's a pretty, it's a pretty chart, Mr. Ely. I'll grant you that. Okay. Your reaction to me was exactly what the district court said. Right. It's a pretty chart. Now, let's go on to something else. Yeah. That was our problem. Because with respect to the intermingling, the reason we did that chart was to show that, fair enough, it's a fair point. There were, this was not a model of corporate governance or record keeping. I concede that. I don't mean to say other. But, Judge Tolman, each of the files clearly delineated 99.8% of the cases, what corporation they were for. And they were largely grouped together. To say there was not intermingling, no. That's a legitimate factual finding. It's a legitimate point. But it does not say, if there are intermingled corporate documents, well, go ahead. Cut down the wheat with the chaff. We'll sort it out later. What happened in this case was also important because Mr. Boyer was, well, let me say this. You also raised the issue of apparent versus actual authority. Legitimate point. Except that the agent in this case testified. I knew that Villapanda was for BRC. I knew that Davis controlled, had been appointed to, had authorized custody of ATI. I never talked to Davis. I never subpoenaed Davis. I gave the subpoena only to Villapanda. Okay. But the district court heard testimony from both Davis and Villapanda and found that the authority had been given. Let me talk to you about that. And that goes to the issue which I tried to respond to in your first question, which is factual finding versus legal conclusion. There's no dispute about the facts of this matter. It's the legal conclusion that we object to. In other words, what Villapanda said was they were intermingled. I controlled the premises. Davis told me, you take care of these documents. We agree with that. However, the saying to somebody, you can take care of these documents, is not the same as saying, hey, I'm the custodian, I'm the trustee, and I'm controlling this. Now, you are authorized to give them over to a third party. And Villapanda, this is also undisputed. Villapanda never told Davis they subpoenaed ATI records. Davis never told Villapanda, yeah, you can give these over to the government. What the ---- But if there was an objection to be made, wouldn't Davis ---- Davis is the only party, since he is, in essence, the owner of the documents, who could object to the taking of the documents. The answer to that is no. And here is why. Davis and Villapanda were selling all of the corporate assets, including all the documents and records, to Mr. Berrio. But the sale didn't occur until after the documents were disclosed. That's another factual finding that you've got to overcome. Well, no, that's a legal finding, and I don't ---- It's not a legal finding. It's a factual finding in terms of chronology of events. When did the bankruptcy court ultimately approve the sale? The district court found, as a matter of fact, that it was after the date that the documents were turned over. Well, actually, the sale was approved on the day of the search, on the 19th. It wasn't objected. It wasn't entered until the 20th. Right. And it wasn't final until the 5th of August. Right. I agree with you. But Mr. Boyer had the only thing that needed to be done after the money was paid in the morning, before the agents came to seize everything, was ministerial acts. And the judge specifically found that although he was not the owner, he had a contingent legal interest that was sufficient to give him a right to object under the Fourth Amendment. I understand. Which he did. I understand. Yes. He had done everything save receive back the formal assignments. Then let's go to the last question, which is the harm. Let's take, for example, the attorney-client privilege documents that you claim were improperly taken. As I understood the record, the district court said, okay, point out to me which documents were used against your client at trial. And as the record stands before me, there was no response to the district court's request. Let me explain why, Judge Tallman. The government did not use in evidence any of the seized attorney-client documents. It was our contention, though, that they had reviewed those. And by reviewing those documents, they knew, and you'll see from the multicolored chart, I think that was pink that we did that where we said, see this. They're not introducing this letter from Shepard Mullen into evidence, but by reading that letter, they would know X, Y, and Z, and therefore they would subpoena this document or they would formulate their case theory based on the review of that privileged information. And now on this, on the attorney-client, you've gotten me and put legitimate questions thus far. On this, I stand up full and I will defend this 100 percent. So your theory is you should have had a Castigar hearing in order to determine the taint that must have flowed from the fact that attorney-client privileged documents? That's what we said, but what the district court judge essentially ruled was, well, I'm finding that, to tell you the truth, he didn't even rule on this. He says, I'm finding everything was seized appropriately. He never addressed specifically attorney-client. He found a waiver as to portions of the attorney-client. This is critical. And forgive me, I was looking at the brief last night, and it's gibberish. The reason I became a criminal lawyer because I understood kilos and years in prison and I didn't understand property law. I have those fantasies all the time, but we are where we are. Yes. Okay. But so let me do this. The one thing I can say to you unequivocally is government has no position, no legitimate position on the attorney-client. The government did go to the trustees and obtain specific attorney-client waivers for five specific attorneys. Those were valid waivers. We don't quarrel with that. There's a Supreme Court case that says that. But then the government says that by seizing everything, even though there was no waiver from Villa Plana, from Davis, and Mr. Boyer, with all due respect, Judge Tallman, the Fourth Amendment relies not so much on technical distinctions of property law, not on arcane distinctions from the Middle Ages, but on the realistic, everyday understandings that we go by in society. Mr. Boyer's company had paid a million dollars and had finished the payment before these agents took everything. The trustees were contractually obligated to give him all of those records. They were set forth in the documents. So I accept what you say, that the date of the sale was found against us, but I also can say to you that's not necessarily for Fourth Amendment relatives dispositive. It may be relevant, but it's certainly not dispositive. And I would think the payment of a million dollars pursuant to a contract and the agreement that these trustees would act in good faith to turn over the books and records of the companies that were being purchased would also give Mr. Boyer standing, at least, to say you can't review attorney-client documents between these corporations that are purchased, at least not in the absence of a waiver from Davis or Villa Plana. Would you just explain to me what should have been done here in order to, for the government to be able to look at these records? Yes, yes, Your Honor. First of all, with respect to the BRC documents, given the factual findings of the court, we essentially say they had the right to go in there and to go through all of the documents and say if this is property of the BRC company, we have a right to obtain it, even if it's beyond the scope of the subpoena if the trustee says basically take what you want, which is what he did with respect to BRC. With respect to the ATI documents, with respect to that document, they should have done nothing or just given Mr. Davis a subpoena and said we're subpoenaing the records. But didn't Davis and Villa Plana agree that Villa Plana would take custody and control over all documents because of the interrelation? Yes. And maybe I am making an arcane distinction now, Judge Warlaw, but what I understood the testimony to be, largely uncontested, is the documents were there. Villa Plana was in charge of the area, so Davis said you keep custody of the ATI records too. To my mind, especially given the fact that bankruptcy law gave Davis plenary legal authority, that the agent knew that Davis was the person that was a separate corporation, that the government had an obligation just to procedurally give Davis a subpoena or at least ensure that Villa Plana Let's see why if Davis and Villa Plana agreed, well it's in Villa Plana's declaration that the relationship among the companies were unclear and so Davis and he agreed they should be all treated as a single entity over which he would be in charge of the documents. But for example, Judge Warlaw, let me just say this, for example, not only did the government take all the BRC documents and all the ATI documents, there were three separate corporations that were completely unfaithful and they knew that, the government knew that at the time. In addition, they took Mr. Smith's private records, they took Mr. Boyer's corporate records for another company that had not even been established as of the time of the bankruptcy. Well what is the relevance of that? Here is what I'm saying is the relevance, Judge Schroeder. The government, instead of either getting a search, the other answer to your question is the government could have obtained a search warrant. It could have gotten a search warrant. But what they did was to take 10 armed agents with a subpoena and seize every piece of paper in the building. They seized 52 boxes, personal records of various people, unrelated corporate entities. Well you're not trying to suppress any of that. Yes. We moved to suppress the records from Optus, Novaterra, and Worldwide. We moved to suppress and seek a Cassegard hearing on the issue of the attorney-client privilege with all of the corporate entities. Well that's a different question. Put that to the side then. Yes. What we were trying to suppress was ATI documents, all corporate records of Novus, I'm sorry, Novaterra, Optus, and Worldwide, which were corporate entities which were distinct and which were not even mentioned in the subpoena. Not even mentioned in the subpoena. And which Villaplana had no control over? Villaplana had no control over them. They were subsidiaries of ATI, but they had separate boards of directors. So Davis was the person in charge of those. But the thing is, the subpoena is so broad. It's please provide records relating to, so if those companies were subsidiaries of Advanced Technology International, they would relate to Advanced Technology International. And this is one of the broadest subpoenas I think I've seen. Judge Whitlaw, I agree with you. Here is my point though, that the purpose of a subpoena is at least to specify documents, and the government has the right to enforce it fully. The purpose of a search warrant is to secure a judicial determination of probable cause and commit the seizure. But what the government did here is something in the middle that is very ugly, to go into a place and over repeated objections and over the requests of the attorney, and I see the red light, Judge Schroeder, so may I just? Can you just finish what it did that was just so wrong, since it had a subpoena, and there were people there who had control. And they literally removed every piece of paper regardless of what it pertained to or who wrote it. Well, the only thing I can see that I think the government did wrong, but I don't know if it's, and I don't think it was necessarily illegal, was kind of taking advantage of the fact that the companies were in bankruptcy to get the subpoena and get all of those documents, which it might not have been able to do had the business been an ongoing regular business. I don't see how that violates any laws. That may be why you're hurt, but it's not necessarily a legal violation of the law. Let me shut up and ask you if maybe you'll give me a couple of minutes. We'll give you a minute on rebuttal. We'll hear from the government. Thank you so much. Thank you. Good morning. Kyle Hoffman for the United States. And if I may, I have a chart that I made up prior to oral argument and went through a lot of trouble to ask permission for the Court to use, and I need to set it up. Okay. Thank you. This is a colorful case. That's colorful characters, that's for sure. Maybe you should move it back a little so that counsel can see. You've seen it. I can't. Thank you. Now, in order to address the three points that Mr. Ardial has raised here this morning, I think it's helpful for all concerned to get a fix on the state of play in the summer of 1999 when the subpoena production occurred. And what I'd like to direct the Court's attention to is, and Judge Tallman had mentioned this initially, it's agreed and not disputed here on appeal that the purchase of the assets of Basic Resource Corporation, Advanced Technology, and the subsidiaries was not final until August of 1999. That is, after the date of July 19th, 1999. That is when this production occurred. So as of July 19th, 1999, the people with authority over the assets of Basic Research Corporation, Advanced Technology, and the wholly owned subsidiaries of Advanced Technology were the two bankruptcy trustees. That's Mr. Villaplana and Mr. Davis. And I think so far we're on agreed turf. There was a subpoena issued in early May of 1999 for, as Judge Wardlaw has indicated, very broad for documents directly related to BRC and ATI. Now, the Court found that that subpoena encompassed all the documents of Basic Research, all the documents of Advanced Technology, and even though it didn't mention these companies by name, Octus, Worldwide, and Notaterra. So the subpoena covered all that territory. And what I think the factual ground indicates is that all that territory was within the authority of Villaplana and Davis. So what I mean is all those documents were within the authority of Villaplana and Davis. Now, the subpoena has been issued. There are some discussions between Villaplana, and it's issued to Villaplana only, though there is indication in the record that Davis did receive a copy of the subpoena. There's some discussions between Villaplana and the agent, Agent Orlando. There's delay in the production. And then it's agreed that on July 19, 1999, the government will come and get the documents from Dowdy Drive. Now, it's important to note that Mr. Villaplana, what he said, it wasn't just go get the documents responsive to the subpoena. It was go get the documents from Dowdy Drive. And the excerpts of record, that's his declaration on 585. He also testifies to that 885 and 887. So I would suggest that his consent, as it were, is a bit broader even than the subpoena. To the extent he's got control over those documents, he's saying go ahead and get them. The other thing I should say in response to Mr. Iredale's impassioned plea that this was ugly and so on, is that there was a comment that the district court made that as far as he could see, the way this was done was an accommodation to the trustee. I believe that's at page 807 of the excerpts of record. It's an accommodation to the trustee, Villaplana. So, now. Counsel, did Mr. Villaplana testify that the reason he did that was because the estate just didn't want to incur the expense of hiring, of paying its own lawyers to do what would have been a very time-consuming and expensive document production? Judge Holman, I reviewed all of the record last night. I didn't see that explicit testimony. It's a fair inference, but I didn't see that testimony in the excerpts of record. It makes all kinds of sense, given he's trying to minimize the expenses for the banker corporation and so on. Now, just a word or two about what happens on July 19th and then a little bit later in August of 1999. First, there was an agreement struck with Mr. Boyers. Mr. Boyer was on the scene, and he called up his lawyer, who at the time was Michael Litman. And there was essentially an agreement struck that, well, put aside the documents of what's called Smith Technology Gensley Group, which was the managing partner, so to speak, of Smith Technology and Boyer. And that was the agreement struck. And I should emphasize that at no point in that agreement was struck was it said, no, you can't take any basic research documents that are in Mr. Boyer's – I used scare quotes on this – Mr. Boyer's office. The agreement was set aside Boyer's, Gensley Group's, Smith Technology documents. Everything else goes. Okay. Now, there's a little bit of back and forth – I'll call it dispute – about how strict the agents were about adhering to that agreement. Okay. And there's some claim that essentially, even though they were supposed to put those documents aside, they didn't at the time. The point I should make here is there's also in the record all of these documents, all of them, that the government took at the time were set aside and not looked at again until August of 1999. They were looked at by Mr. Boyer. So this was similar to the procedure that our case law has contemplated that in the middle of a search, when agents are executing a warrant and either the subject of the search or his lawyer contacts a U.S. attorney and says, hey, there may be privileged documents here. There's an agreement made to put them in a box or to segregate them for review. That's correct. So this is the kind of an agreement we're talking about? Correct. Now, what I should mention then is, so of these documents, Boyer, Gensley Group, Smith Technology, some were put aside on July 19th. There's no dispute about that. And then the remainder, Mr. Boyer personally looked at every single document in the universe to get out any from Boyer, Gensley Group, and Smith Technology. That would include, necessarily, any interim client privilege document of these individuals. He looks at everything. And that's on August 11th. And then on August 13th, there's a little neutral, someone unaffiliated with the investigation from IRS and Mr. Boyer's attorney. They hash out, well, what's basic research? What's Mr. Boyer's? And the ones that they all agree are Mr. Boyer's, they go back to Mr. Boyer. So what I'm trying to suggest, by way of this chart and this factual background, is that this whole universe of documents, Boyer, Gensley Group, Smith Technology, including attorney-client privilege documents, they're out of the picture as of August 1999. None of these are introduced. Not only none are introduced. Did the government review them? Did the government review the attorney-client privilege documents before Mr. Boyer had a chance to go through? I will answer that question with yes and no. Yes, it appears to be the case, and I wish I didn't have to say this. I wish the agents had simply said, okay, he makes a claim. It's Smith Technology. It goes into that box. But it appears that one of the agents, at least, may have glanced at it and said, no, I don't agree with you. It goes into this other box. So that's conceived. When you say the agents, are you talking about AUSAs? You're talking about investigators? Investigators, correct. Now, remember, there are 51, I think, 51 bankers' boxes in all, something like that, taken. And this is going very quickly, and the testimony seems to be, well, some of the ones that Mr. Boyer said are here. The agent, that is, there are Boyer, Gensler, Groves, Smith Technology. It may be attorney-client privilege. The agent says, well, no, I don't agree with you. It goes into this box. But it did. I guess the defense counsel, Mr. Howard, made the assertion that the harm that flowed from this was that even though the government didn't use these documents at trial, they had access to them and the information contained in them and could use them to develop their case. This is where I want to expand a little bit. We're only talking about one day, July 19, 1999, on this kind of very spur of the moment, it goes into this box or this box. So maybe the agents saw some attorney-client privilege documents on Boyer, Gensler, Groves, and so on then. Maybe. It's not absolutely clear, but probably. But what happens is they all go among the rest of the documents and are set aside until August 11, 1999, when Mr. Boyer goes and looks at everything. So the government's not looking at them in between, and they're given back. So there are no attorney-client privilege documents as of August 13, 1999, in the government's hands at all. Can't use it for investigation. Obviously not introduced at trial. Now, Mr. Irediel was very impassioned. There's a breach of attorney-client privilege, et cetera. But the important thing to note is who's the client and who's the attorney? These entities, Basic, Advanced, Office, Notaro, Worldwide, they're not here complaining. They're the clients. The only person with attorney-client privilege that would have a complaint is Mr. Boyer, Gensler, Groves, and Smith Technology Development. And Judge Wardlaw, I think this was in response to Judge Schroeder's question, I wish it were the case that the agents had simply, as soon as they said, Smith Technology Development, put it in one box and didn't look at it. But I can't honestly say that's what the record says. They may have looked at something. That's where I direct the court to the Rogers case, which essentially says, in that case, if I remember correctly, a government agent interviewed ex-counsel, someone got attorney-client privilege information, and there was a claim the indictment must be dismissed because of outrageous government conduct. The court said, no, attorney-client privilege is an evidentiary privilege. Your remedy is to exclude this information at trial. By hypothesis, all the attorney-client privilege, actually not by hypothesis, by fact, documents that they have, they're excluded at trial. The government didn't have it, didn't introduce it at trial. In fact, it's conceded in the reply brief. None of this was introduced at trial. So is that what Judge Miller was referring to in his order when he said to the defense, okay, identify those documents which you say are, and they didn't do it? And that's where, I mean, I understand there was a lot of labor involved in that very long pleading. But the question is, is the labor adequate to the purpose? What is the attorney, what is the client, and why do you have the claim that there's, you know, that this is, the attorney-client privilege has been breached? And that's what we're saying, what I'm saying. To fault Judge Miller under these circumstances, if I were him, I'd feel a little funny. He was faced with a lot, lot of work, a lot of documents, a lot of testimony, and a lot of witnesses. And he did his very able best to sort it out, including a lot of live testimony for him to assess credibility. And even then he said, look, if you have a claim, show me. I leave this open. And that invitation was not taken. So now that, I think, addresses the attorney-client privilege issue. And I'll move on to the other issues, unless there's some further question there. Has there ever been a contention here? I thought it was a little unclear, as to bad faith. I don't think so. But I might, I already only beg to differ on that. I don't think there is in the record. Well, I assume that the strongest evidence would be that IRS agents on July 19 who were looking at things that he doesn't think they should have looked at. Right. When Mr. Boyer said, no, put that in the privilege box. But that, there's never been, there was never, as far as you were concerned, there was never an allegation that they went in there in order to get privileged documents. Correct. Correct. And the thing I should say also, the Rogers case also indicates, and it's also in, I think it's the NRA grand jury subpoena case, 926. There can be instances in which the infringement of attorney-client privilege reaches a level of outrageous government conduct, and then there's a drastic remedy. Notice it's not, have a Castigar hearing. It's kind of a one thing or the other. And there really hasn't been, even though that's kind of lurking in the background, there really hasn't been an actual claim. This is outrageous government conduct. We should have this drastic. Why don't you turn to the rest of the case? Okay. And I assume you're going to say something on the cross if you. I will. I'll have to think real quickly what that will be. Now, as far as the claim of, I put this in scare quotes, Boyer's office. I think Judge Tomlin was exactly right. The district court made findings about that, and we would contend that they are essentially factual findings. And in every one of these subpoena slash search warrant cases, the rule is very clear. Suppression is reviewed de novo, but essentially factual findings underlying those rulings are removed for clear error. And we would say there's no clear error here at all. Now, some of the dispute, so to speak, is really not a dispute. It's clear Boyer was there with the Villaplana's authorization. What Villaplana contested, what he said, was, yes, he's there. And, you know, I remember there was an agreement struck. He could use a desk, and he would pay for the phone line. But he maintained, and never backed off of this, I didn't give Boyer basically the right to set up a private partition and an office to the exclusion of me. Okay, that's one thing. And then I would call the court's attention to, at the time, July 19, 1999, and I tried to hit this when I talked about the factual background, there really wasn't any claim, oh, you can't take basic research's documents, you can't take ACI's documents out of Boyer's office. The claim was, don't take these documents, Boyer's, Gensley's, and Smith Technology's development. What is the point of that? The point is, the claim is about who has authority over the documents. It's acknowledged by the actions and the agreement of the attorney that Villaplana has the authority to give those documents up. Yeah, he does. And maybe this is a question of bankruptcy law. But if this had been an ordinary, I mean, if this company had not been in bankruptcy, and the documents had been subpoenaed, they would have the right to go through the documents and take out things that they did not believe were responsive to the subpoena or were attorney-client privilege. I guess what troubles me is it seems that given that the trustee is supposed to be the guardian of this company while it's in bankruptcy, that he would seem to have to have some duty to, you know, assert basics, attorney-client privilege, and contest the subpoena. He didn't do that. Your Honor, here's what I'd suggest about the Court's question. I've had a few of these cases now where fraud cases arise out of bankruptcy proceedings. And the bankruptcy trustee has a duty essentially to the creditors of the corporation, and it actually may benefit the creditors of the corporation to discover the underlying fraud of the companies. They waive the attorney-client privilege all the time in these circumstances is my admittedly brief experience, but I've had enough times to know that this happens. So, yes, maybe, and there's no indication that Villa Plana didn't make a calculated decision. I'm trying to get money for the creditors. That may mean getting money back from some of the people underlying this, Mr. Smith, Mr. Boyer, and so on. I'm going to waive the privilege. So that would be my answer to the Court's question. Can you address across the field? Could I just ask you one question with respect to the relationship of the debtor and the trustee? When something like this, when the trustee comes in and takes possession of everything and the debtor hypothetically is engaged in fraud, can the debtor retain any kind of rights to or reserve any kind of Fourth Amendment rights to prevent the trustee from turning things over until he has a chance to look at it? I'm not sure I know the answer to that question in general. I think here Judge Miller, again, did a very careful job of parsing the situation because he said Mr. Boyer has standing. He can object, but I find for these essentially factual reasons that that does not overcome the authority of the bankruptcy trustee and essentially the consent of the bankruptcy trustee under these circumstances. So I think the answer to the Court's question is yes and no. But in these circumstances they didn't do it in any way. I'm sorry? I guess they didn't do it here. Well, the Court, I mean, he took seriously the claim the debtors and actually the prospective purchasers had some interest. It's just that they couldn't overcome the bankruptcy trustee's authority. Did Mr. Villaplana talk about any of the communications that he'd had with the lawyers for Mr. Boyer, Mr. Smith, and so on before he made the determination to allow the agency? Again, having reviewed the record again pretty closely, I don't think so. I don't think so. Interesting. Do you want to talk about the sentence? Sorry? Do you want to talk about the sentence? Yes. And I stand before the Court with the wind taken somewhat out of my sails by the recent Supreme Court call decision. And when I wrote my reply brief, I had thought I had done a very comprehensive and careful analysis of all the ways in which the district court's decision could be remanded as being unreasonable. I confess after the call case that I probably, even if under a kind of guidelines analysis there would be a problem, the reasonableness analysis kind of does away with that problem through the back door. Where that leaves the guidelines in this situation. And now you see the guidelines, now you don't. Essentially. And the question might be, what do we even have them for at this point? But that's another question for another time. What is the bail status in Mr. Boyer? Both defendants, Mr. Boyer and Mr. Smith, are currently on bail. They've been on bail for a long time. This case is pretty old. And what sentence did Mr. Smith get? Mr. Smith? Three years. Okay. Thank you very much. Thank you. Having heard a very gracious concession, then I don't want to suggest that there will be jackboots in the street if we don't win the appeal. But I do need to take a moment, if I could, to explain something. Because the facts are so, it took me six months to understand the entities. So I know we're dumping all of this on the court. But I do need to just talk to you about this attorney-client issue for a moment, if I might. Here's what we were saying. Here's what the situation is. Mr. Boyer was basically the purchaser. He was buying these things from Davis and Villapana and had made the final payment to do that on the day the agents came in and seized everything. Now, the attorney-client privilege issue goes to all of these entities. On page 26 of my brief, I list out all of the various law firms and lawyers who had correspondence, not with one of the entities, with almost all of them. In other words, there would be legal advice given to officials of DRC, the ATI, the opposite of the terror. And what we objected to, but what was not the only violation of attorney-client privilege, was specifically here. Because Mr. Boyer's corporate records had to do with a corporation that did not acknowledge the death of that subpoena. It had nothing to do with, nobody would ever argue that what they seized from his office had to do with anything in that subpoena. It was a corporation formed after the bankruptcy began. And what happened is Mr. Boyer did protest on page 643 of the excerpt of the clerk's record. There's testimony. He said, you can't come in here and seize documents. There's attorney-client privilege documents. And his attorney got on the phone and was saying to the agent, it wasn't the genial working out of an agreement. He was saying, you're using a subpoena like it's a search word. You can't do this. Ultimately, they struck an agreement. The agents would be permitted to take whatever they wanted, but at least segregate these documents in a different place. But in doing that, Mr. Boyer would say, well, that's not supposed to be taken. That's this kind of document. And the agent would then, instead of taking that as work, since the agents were going to sweep in everything to begin with, the agent read the whole document. Or at least reviewed it to an extent that was more than a mere glance. But our attorney-client objection doesn't just go to this and what they did there in the office by reading stuff that he said that's privileged. Well, let me read it and see if it's privileged. What happened is there were explicit waivers for the communication between corporate officials of these entities and five lawyers. We don't quarrel with that, but there were 14 other lawyers or law firms who gave advice. Now, as of August the 5th, these records, including the attorney-client records, they belonged to Mr. Boyer's company. The government had them, but they were physically, they were legally his as of that date. But we're back to the problem of the dates, aren't we? The question is whether or not that pertained to July 19 as opposed to August 9. No, not at all. On this point, no, Judge Holman. The date is irrelevant because regardless of who has physical possession, those are privileged documents. But he has to be the owner of the privilege. That's the problem. He is the owner of the privilege because there was no waiver from Philip Lawman Davis. The documents are in the possession of the government, and he owns all of those documents legally. As of the 5th of August. As of the 5th of August. In other words, follow me here. The government seizes it on the 19th, and it's questionable. If you want to go with the district court, that's fine. But on the 5th of August, by anybody's accounting, all of the books and records and all of the attorney-client privileges appertaining thereto, they don't belong to trustees. They belong over here. And he says, I want them back. And the government says, well, Villa Plana says we can take everything. But the act of Villa Plana saying you can take everything did not constitute a waiver of, as I say on page 26 of the brief, 14 different correspondence. And so what the government did, and finally, Judge Holman, and I apologize, Judge Schroeder, but if I could just address, because you were saying, well, where is the harm? What happened is the district court judge said to us, well, if you want to object again on a document-by-document basis when it comes in at trial or another time, go ahead. The government has intelligent people. Their mother did not raise any retarded children. The prosecutor was smart. If it's a privileged document that he used to construct the indictment, but it's from attorney X to Mr. Boyer, attorney Y to a former corporate official for a court decision. We understand that. We understand your position. They didn't introduce it in evidence, so we couldn't object. We understand. Thank you. Thank you very much. The case just argued is submitted for decision. That concludes the Court's calendar for this morning. Court stands adjourned.
judges: Schroeder, Wardlaw, Tallman